IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

v.

JAMES THOMAS SWILLEY,

        Defendant.

CRIMINAL ACTION FILE
NO. 4:12-CR-0016-RLV-WEJ

## **NON-FINAL REPORT AND RECOMMENDATION**

This matter is before the Court on a Motion to Suppress Evidence [14] filed by defendant, James Thomas Swilley. The Court conducted an evidentiary hearing on said Motion on November 8, 2012 [27], which has been transcribed [28] (hereafter "Tr."). The parties have briefed the matter. (See Br. Supp. Mot. Suppress [42] ("Def.'s Br."); Gov't Resp. to Def.'s Mot. Suppress [45] ("Govt.'s Br.").) On the basis of the testimony and evidence produced at that hearing, the undersigned **REPORTS** that law enforcement's entry into defendant's home was legal given the invitation from his wife to search for illegal weapons; therefore, seizure of the sawed-off shotgun in plain view did not violate defendant's Fourth Amendment rights. Moreover,

defendant's wife was not an agent of the Government. Accordingly, the undersigned **RECOMMENDS** that defendant's Motion to Suppress [14] be **DENIED**.

## I. STATEMENT OF FACTS

### A. Events of January 18, 2011

On January 18, 2011, Susan Swilley, defendant's wife, came on her own accord to the Paulding County Sheriff's Office ("PCSO") to report a domestic dispute. (Tr. 57.) She first met with Detective Griggs, who then introduced her to his supervisor, Sergeant Mike Hill, of the Criminal Investigations Division. (Id. at 46-49, 57; see also Def. Ex. 3.) In their meeting, Ms. Swilley provided Sergeant Hill with some negative information about her husband, asserting that he was paranoid, drug addicted, and possessed illegal weapons (such as a silencer) which he might use against someone named Wyatt Ross. (Tr. 50, 52-53, 57-58.)[1] Sergeant Hill asked Ms. Swilley to look for the weapons when she returned to the residence that she shared with defendant and report back if she found them; she agreed to do so. (Id. at 50-51, 56, 59.)

Ms. Swilley returned home, contacted Sergeant Hill, and informed him that she had looked for the weapons but had been unable to locate them. (Tr. 51.) She offered

---

[1] Ms. Swilley showed Sergeant Hill a photograph of a cylindrical object on the end of a SKS rifle. (Tr. 60.)

2

to continue to look for the weapons and get back in touch with Sergeant Hill later. (Id.) However, she did not bring any weapons to Sergeant Hill on January 18. (Id. at 51, 53, 58.)

## B. Events of January 22, 2011

Between 7:00 and 8:00 p.m. on January 22, 2011, PCSO Patrol Deputies Joseph Perkins and Trent Tanchin responded simultaneously (in separate vehicles) to a call at 393 Dallas Nebo Road for a reported domestic dispute involving a weapon. (Tr. 6-7, 22-23, 32-33, 44.) Deputies Perkins and Tanchin made contact at the front door of the residence with the victim–Ms. Swilley–and her child. (Id. at 6, 33.)[2] When asked what happened, Ms. Swilley was frantic and reported that her husband (defendant Swilley) had threatened her life and the life of their child, threatened to remove the power box from the house, and warned her that if she called 911, then she would be dead before officers arrived. (Id. at 6-7, 20, 33, 44.)[3] She also explained that she had called 911 earlier that day, but the dispute had escalated when her husband issued the above

---

[2] Deputy Perkins testified that, to his knowledge, Mr. and Ms. Swilley were married and resided at the residence on Dallas-Nebo Road. (Tr. 20.)

[3] The testimony summarized above is from Deputy Perkins. Deputy Tanchin testified that Ms. Swilley reported her husband's threats to remove the power box and to kill her if she called 911 when they spoke after Mr. Swilley's arrest. (Tr. 36.)

3

threat, leading her to call 911 a second time. (Id. at 7.)[4] During this initial conversation, the deputies stood at the front steps of the residence while Ms. Swilley was inside the front door. (Id. at 7-8, 33; see also Gov't Ex. 1-B (picture of residence).)

Deputy Perkins noticed that Ms. Swilley's child appeared rattled and emotional, so he asked the child if he was alright. (Tr. 8.) The child responded that his daddy had scared him. (Id.) Ms. Swilley advised the officers that her husband had barricaded himself in the detached garage located beside the residence and might be armed. (Id. at 8-9, 21, 23, 33-34; see also Gov't Ex. 1-C (picture of detached garage).) The officers then went to that garage (escorted by Ms. Swilley) to make contact with defendant. (Tr. 8-9, 24.)

The Deputies made multiple attempts to contact Mr. Swilley, by first knocking on the garage's front door, knocking on its back door, and then announcing that they were law enforcement officers, but with no response. (Tr. 10, 33-34.) After about the fourth or fifth announcement, Mr. Swilley finally responded and asked who was there;

---

[4] Deputy Perkins was aware of the earlier 911 call that day but did not know the details. (Tr. 21-22.) Deputy Tanchin learned from an officer who had responded to that earlier call that Mr. Swilley had allegedly threatened to kick his wife and child out of the house, but had left before deputies arrived. (Id. at 36, 40, 44-45.)

4

the officers directed him to exit the garage. (Id. at 10, 23, 34.) As they were issuing their third directive for Mr. Swilley to exit the garage, he came out the rear door. (Id. at 11, 34.)[5] He complied with the officers' directive to get on the ground. (Id. at 11, 24, 34.) Defendant was then detained (i.e., handcuffed), searched for weapons (none were found), and placed in the back of a patrol car. (Id. at 12, 24, 34-35, 41.)[6] Defendant was neither questioned nor made any statements as he was escorted to the patrol car. (Id. at 13.) As events unfolded, other deputies arrived on the scene (for a total of four or five). (Id. at 13, 23.)

Leaving another deputy to monitor defendant, deputies Perkins and Tanchin went inside the house to speak to Ms. Swilley. (Tr. 13, 24-25, 35.) Ms. Swilley repeated that units of the PSCO had been at the house earlier that day because her husband had threatened to kick her and their son out of the home, but he had left before the deputies arrived. (Id. at 35-36.) She also stated that her husband had multiple guns

---

[5] Somewhere between two and ten minutes elapsed between the first knock and Mr. Swilley's exit from the garage. (Tr. 23, 34.)

[6] Mr. Swilley was not armed, but almost every pocket in his pants and jacket contained pipes, tools, fittings, screws, and bolts usually associated with plumbing or HVAC. (Tr. 12, 35.) He also had a wallet and keys. (Id.) All of these items were removed from his pockets and left on the ground by the back door of the garage while officers escorted defendant to the patrol car. They were subsequently retrieved and an inventory made. (Id. at 12-13.)

5

(one of which was fully automatic), that a few had been altered to make them illegal (such as a sawed-off shotgun), and he had a silencer. (Id. at 13, 36, 42-43, 45.) She added that she was unsure whether the guns were in a safe located in the residence or out in the garage. (Id. at 13.) The deputies asked if they could see the weapons. (Id. at 45.)

Ms. Swilley then accompanied the deputies to the detached garage, where they conducted a "plain view" sweep (not a search), but saw nothing incriminating. (Tr. 14, 24-25, 37, 41.) Ms. Swilley remarked that the guns must be in the safe in the back bedroom of the house, that she did not want the guns in her house, but that she did not know where the keys were to the safe. (Id. at 14, 21, 25-26, 37, 45.) Deputy Perkins then showed Ms. Swilley the key chain that he had taken from defendant, and she identified some keys on that chain that would open the safe. (Id. at 14, 26, 42.)

Ms. Swilley led the deputies back inside the residence to the back bedroom and opened the safe.[7] (Tr. 14, 21, 26, 36-37, 42, 45-46.) Deputy Perkins then spotted a sawed-off shotgun, located in plain view between the safe and another piece of

---

[7] Ms. Swilley was able to identify which key on her husband's key ring fit the safe, and she was able to go directly to the safe and open it. (Tr. 30, 37.) The room in which the safe was located contained a computer, was cluttered, and appeared to be used by the family for storage. (Id. at 31, 38.)

6

furniture. (Id. at 14-16, 26, 37-38; see also Gov't Ex. 1-R.)[8] The deputy testified that the sawed-off shotgun was not inside the safe, but that he did not see it until after Ms. Swilley had opened the safe. (Tr. 16-17, 26.) Deputy Perkins also made clear that he and Deputy Tanchin did not demand to see the guns, but asked for permission to see them, which Ms. Swilley granted when she led them to the room where she believed the guns were stored. (Id. at 21.)

The deputies did not formally ask for consent to search the house for weapons. (Tr. 27.) However, Ms. Swilley gave them permission to be in the bedroom where the safe was located. (Id. at 37.) No one asked Mr. Swilley for consent to search either the garage or the bedroom where the safe was located. (Id. at 41.)

When the safe was opened, the deputies found a rifle, but Deputy Perkins could not recall the brand. (Tr. 17.) Deputy Tanchin recalled seeing a few rifles and handguns in the safe (one of which belonged to Ms. Swilley's grandfather). (Id. at 37-38.) None of the guns in the safe were seized. (Id. at 38, 43.) The deputies did no additional searching of the residence, as Ms. Swilley indicated that the guns would be in the safe. (Id. at 17, 43.)

---

[8] Deputy Perkins explained that, when Ms. Swilley was unlocking the safe, he was standing to her left, but when she began to open its door, he walked around her to look into the safe and spotted the shotgun next to the safe. (Tr. 27.)

7

After the deputies determined that the shotgun was illegal, they seized it and later placed it into evidence at the PCSO.[9]  (Tr. 17, 39.)  Deputy Perkins then transported Mr. Swilley to the Paulding County Detention Center.  (Id. at 17-18.)  During transit, Mr. Swilley was asked no questions and he made no statements.  (Id. at 19.)

Deputy Perkins testified that neither Sergeant Hill nor Detective Griggs came to defendant's residence that day, and that he had no communication with either of them while he was at the scene.  (Tr. 28.)  To his knowledge, no other officer at the scene had any communication with Sergeant Hill or Detective Griggs.  (Id. at 29.)  Neither deputy was aware that Ms. Swilley had been in contact with PSCO personnel a few days prior (i.e., January 18).  (Id. at 29, 42.)  Deputy Tanchin also testified that, during the time he was at defendant's residence, he had no contact with either Sergeant Hill or Detective Griggs.  (Id. at 42.)  Sergeant Hill confirmed that he did not go to the Swilley residence on January 22 and had no involvement in defendant's arrest.  (Id. at 51-52, 60.)

---

[9] Photographs show that the shotgun seized had a barrel shorter than eighteen inches.  (Tr. 18, 19-20, 38-39; Gov't Exs. 2-4.)

8

### C. Events of January 24, 2011

On January 24, 2011, Ms. Swilley again traveled on her own volition to the PSCO and gave Sergeant Hill a silencer that she said belonged to her husband. (Tr. 54, 59-60.) Sergeant Hill used information from January 18, 22, and 24 to put together a search warrant for the Swilley residence. (Id. at 52-53.)

## II. THE INDICTMENT

On June 19, 2012, the grand jury returned a two-count Indictment [1] against Mr. Swilley. Count One charges that, on or about January 22, 2011, in the Northern District of Georgia, defendant knowingly possessed a firearm, a Savage Arms model 94 12-gauge shotgun having a barrel of less than 18 inches in length, not registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871. Count Two charges that on or about January 24, 2011, in the Northern District of Georgia, defendant knowingly possessed a firearm, a silencer as defined by 26 U.S.C. § 5845, not registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871.

AO 72A
(Rev.8/82)

## III. LEGAL ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Although officers generally may not search a home without a warrant, they may conduct a search "with the voluntary consent of an individual possessing authority." Georgia v. Randolph, 547 U.S. 103, 109 (2006).

In Randolph, both the defendant and his estranged wife were at the threshold of the residence when police arrived. 547 U.S. at 107. The officers first asked Randolph for consent to search; after he objected, the officers turned to his wife, who consented. Id. The Supreme Court held that a stated refusal to permit entry by a physically present co-occupant prevails over the consent to search by the other co-occupant, rendering a warrantless search unreasonable and invalid as it affects the non-consenting co-occupant. Id. at 121; see also United States v. Delancy, 502 F.3d 1297, 1308 n.7 (11th Cir. 2007) .

In deciding Randolph, the Court carefully distinguished and preserved the holdings in two earlier cases involving challenges to the consent to search a defendant's residence: United States v. Matlock, 415 U.S. 164 (1974), and Illinois v. Rodriguez, 497 U.S. 177 (1990). In Matlock, the defendant was being held in a squad

10

car near his dwelling, but was not given the opportunity to object to the search. 415 U.S. at 166; see also Randolph, 547 U.S. at 121 ("Although the Matlock defendant was not present with the opportunity to object, he was in a squad car not far away."). In Rodriguez, the defendant was asleep in the residence, but was not given a chance to object to a search. 497 U.S. at 179; see also Randolph, 547 U.S. at 121 ("defendant was actually asleep in the apartment, and the police might have roused him with a knock on the door before they entered with only the consent of an apparent co-tenant").

In both Matlock and Rodriguez, the Court held that consent to search by a co-occupant of the premises was valid. After reviewing both cases in Randolph, the Court stated that the "fine line" it was drawing was this: "if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice . . . whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out." 547 U.S. at 121. The Court, however, continued qualifying this "fine line" by stating that it stands "[s]o long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." Id.

11

The Supreme Court also was careful to explain that the holdings of Matlock and Rodriguez "are not to be undercut by today's holding." Randolph, 547 U.S. at 121. In Matlock, the defendant was arrested in the front yard of the house that the police officers wished to search, but for which they had no search warrant. 415 U.S. at 166. "Although the officers were aware at the time of the arrest that respondent lived in the house, they did not ask him which room he occupied or whether he would consent to the search." Id. Instead, the officers spoke to another resident, who voluntarily consented to the search of the house. Id. The Supreme Court held that the resident's consent was "good against 'the absent, non-consenting' resident." Randolph, 547 U.S. at 121 (quoting Matlock, 415 U.S. at 170).[10] Thus, Matlock controls "as long as there is no evidence that the police intentionally removed the potentially objecting co-tenant for the sake of avoiding a possible objection." United States v. Weeks, 666 F. Supp. 2d 1354, 1379 (N.D. Ga. 2009).

Moreover, nothing "'in Randolph suggests that the police must offer . . . an opportunity [for an arrested defendant to object to the search].'" United States v. Gamory, No. 1:08-CR-153-TWT, 2009 WL 855948, at *15 (N.D. Ga. Mar. 30, 2009)

---

[10] The facts of the instant case essentially mirror those of Matlock.

AO 72A
(Rev.8/82)

(quoting United States v. Travis, 311 F. App'x 305, 310 (11th Cir. 2009)). Rather, the Eleventh Circuit has observed that,

> the Randolph Court stated that "we think it would needlessly limit the capacity of the police to respond to ostensibly legitimate opportunities in the field if we were to hold that reasonableness required the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received."

Travis, 311 F. App'x at 310 (quoting Randolph, 547 U.S. at 122); see also United States v. Hicks, 539 F.3d 566, 570 (7th Cir. 2008) (removing a person from the scene because of a legitimate arrest does constitute removing him so that he could not object to a search).[11]

Defendant states that the deputies did not ask him if they could search his home. (Def.'s Br. 3.) However, under the above-cited authorities, they were not obligated to do so. Moreover, there is no evidence that the deputies intentionally removed Mr. Swilley from the home for the sake of avoiding a possible objection to a consent search. He was removed and placed in a patrol car following his arrest for the threats he had made against his wife and child. The consent to search that the deputies

---

[11] The fact that consent came from a co-occupant who had "no love lost" for the defendant is immaterial. See United States v. Bertram, 805 F.2d 1524, 1528 (11th Cir. 1986) (holding that defendant's wife, who had joint access to marital home, had actual authority to consent to search of home; court rejects defendant' claim that her hostility toward him rendered consent invalid).

13

received from Ms. Swilley was sufficient. She was married to defendant and resided in the house with him. She had authority to allow the deputies to enter and search. Matlock, 415 U.S. at 172. Although the record does not reflect that the deputes specifically asked, "May we have consent to search," it was clear that Ms. Swilley invited them into her home so that they could seize the possibly illegal weapons she knew were stored there. The deputies saw the shotgun in plain view, and noticed, given the short length of the barrel, that it was not legal to possess; a quick application of a tape measure confirmed that suspicion. See Horton v. California, 496 U.S. 128, 136-37 (1990) (plain view seizure allowable if officers lawfully present in location where item seized and incriminating nature of the item is immediately apparent.)

Defendant also contends that the evidence seized should be suppressed because Ms. Swilley was acting as an agent of the Government. (Def.'s Br. 4.) The primary case cited by defendant provides as follows:

> A search by a private person does not implicate the Fourth Amendment unless he acts as an instrument or agent of the government. United States v. Ford, 765 F.2d 1088, 1090 (11th Cir. 1985). For a private person to be considered an agent of the government, we look to two critical factors: (1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the private actor's purpose was to assist law enforcement efforts rather than to further his own ends.

United States v. Steiger, 318 F.3d 1039, 1045 (11th Cir. 2003).

14

Mr. Swilley argues that his wife came to PCSO on January 18, 2011, told Sergeant Hill about her husband's possibly illegal activities, and was enlisted by the officer to help obtain evidence that could be used to prosecute him. Defendant argues that this shows that the Government knew of and acquiesced in her conduct. Mr. Swilley also argues that, given the agreement between Sergeant Hill and Ms. Swilley, it is clear that her purpose was to assist law enforcement efforts.

The record shows, however, that Ms. Swilley initiated contact with the PCSO to report suspected illegal activities by her husband. She expressed her interest and intent to locate and surrender her husband's illegal firearms with no prompting from law enforcement. However, Sergeant Hill did not instruct Ms. Swilley to assist the PCSO in gathering evidence; he merely informed her that she could contact him if she located the weapons. Thus, Ms. Swilley was not an instrument or agent of the Government, as she sought to further her own ends rather than assist law enforcement. See United States v. Ford, 765 F.2d 1088, 1089-90 (11th Cir. 1985) (brother not acting as instrument or agent of the government when he broke into the defendant's bedroom, located cocaine, and informed the DEA).

Additionally, PCSO deputies arrived at the Swilley residence on January 22, 2011, in response to her 911 call; those who responded had no knowledge of any prior

15

contact between Ms. Swilley and Sergeant Hill. Moreover, Sergeant Hill had no contact with the deputies on the day of the seizure. Instead, Deputies Perkins and Tanchin entered the residence at Ms. Swilley's invitation and seized an illegal weapon in plain view. Thus, there was no connection between Ms. Swilley's visit to the PCSO on January 18 and the consent search on January 22.

## IV. <u>CONCLUSION</u>

For the reasons stated above, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Evidence [14] be **DENIED**.

**SO RECOMMENDED,** this 1st day of February, 2013.

*[signature]*

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)